UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-332 |
| v. | ) | |
| | ) | |
| RICHARD H. HATCH, JR.; et al. | ) | |
| | ) | |
| Defendants. | ) | |


### *PRO SE* DEFENDANT RICHARD H. HATCH, JR.'S MOTION FOR RECONSIDERATION OF INTERLOCUTORY SUMMARY JUDGMENT ORDER AGAINST HIM ON COUNTS ONE AND TWO

**NOW COMES**, *pro se* Defendant, Richard H. Hatch, Jr. ("Richard"), moves for Reconsideration of the Court's Order granting Summary Judgment against him on Counts One and Two of the Government's Complaint on grounds that the Order will result in manifest injustice.

On June 5, 2025, the Court issued an Order adopting in part and modifying in part the Magistrate Judge's Report and Recommendation. As it relates to Richard, the Court ruled that the Government is entitled to summary judgment on Count One, which sought a judgment reducing Richard's alleged unpaid federal tax liabilities to a civil judgment. The Court also ruled that the Government is entitled to summary judgment on Count Two as to the validity of its tax liens against Richard's "property and rights to property" (in Count Two, the Government asked the Court to declare valid its tax liens against Richard's alleged delinquent tax debt in accordance with 26 U.S.C. § 6321).

The Court's rulings effectively make Richard an economic slave with no hope of emancipation. As the Court well knows, prosecutors and this Court twice prevented Richard from earning money he could have used to pay the entire amounts alleged to have been owed by denying Richard permission to participate in two separate Survivor competitions to which he had been invited. The lien also prevents Richard from international travel where some of his more promising opportunities of earning a living have come and gone. Now, after 25 years of trying to "Survive" the IRS onslaught of constant attacks, prosecution, imprisonment, and now financial servitude with the help of this Court's Order, Richard is expected to pay the lien with no way of earning a reasonable living in his chosen career path. The 25-year old tax lien has grown by orders of magnitude with every passing year due to the accumulation of unconscionable fees, penalties, and interest. The Order declaring that Richard's "property and rights to property" are subject to the lien result in certain lifelong indebtedness and involuntary servitude for Richard.

More shockingly, the Order is against the great weight of evidence provided below supporting what Richard has believed all along – and now is able to prove – that the income tax giving rise to the Government's lien, in fact, does not apply to Richard's private earnings from the Malaysia Survivor prize money. The Order would thus require Richard to pay a tax he does not owe.

This cannot be justice. Failure to reverse the Order under the circumstances will instead result in manifest injustice. The Court should reconsider its Order in light of the authorities below.

## I.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 54(b), the Court may revise any order adjudicating fewer than all the claims or the rights and liabilities of fewer than all the parties at any time before the entry of judgment adjudicating all the claims and all the parties' rights and

2

liabilities. See *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994); *United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009); *Ellis v. United States*, 313 F.3d 636, 646 (1st Cir. 2002); *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003). Reconsideration is appropriate where there is (1) newly discovered evidence, (2) an intervening change in controlling law, or (3) the need to correct a clear error or prevent manifest injustice. See *United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009).

The First Circuit recognizes that district courts have the inherent power to revise any interlocutory order at any time before entry of final judgment. *Perez-Ruiz*, 25 F.3d at 42. District courts have the inherent power to reconsider interlocutory orders "for any reason they deem sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *U.S. v. Allen*, 573 F.3d at 53. The First Circuit affirmed that reconsideration of interlocutory orders is available to prevent "manifest injustice," and that the "law of the case" doctrine is not an absolute bar to reconsideration where manifest injustice would result. *Ellis v. U.S.*, 313 F.3d at 646. In *Cochran* the Court reiterated that "manifest injustice" is a recognized ground for reconsideration of interlocutory orders, and that district courts have broad discretion to revisit such orders to prevent manifest injustice. *Cochran,* 328 F.3d at 11. In *Bonner v. Triple-S Vida, Inc.*, the First Circuit reviewed the denial of a motion for reconsideration and stated that it would intervene "only upon a clear showing of manifest injustice, that is, where the lower court's order was plainly wrong and resulted in substantial prejudice to the aggrieved party." *Bonner v. Triple-S Vida, Inc.*, No. 22-1066 (1st Cir. 2023).

Richard here seeks reconsideration on the basis of clear errors of both law and fact that would result in a manifest injustice.

3

## II.    ARGUMENT

### A.  The Court Order Relies on Incorrect and Incomplete Facts.

In making its Order, the Court demonstrated that it continues to rely on faulty and incomplete facts. In 2001, Richard contacted the IRS, informed them he'd won $1M in Malaysia, and provided the IRS with his correct social security number (since CBS initially provided the wrong social security number to the IRS and it had been unaware Richard had received the $1M prize). Richard sought the IRS' assistance with determining whether Malaysia had been paid the income tax on the $1M prize and what, if any, taxes purportedly remained due and owing to the United States.

The IRS spent the next couple of years (with Richard's full cooperation) attempting to ascertain who had paid what to whom and what, if anything, might remain owed to the United States. Without ever instructing Richard how his United States 2000 tax return ought to be prepared, the IRS instructed/demanded Richard file that return. Knowing taxes, if any due, on the $1M prize were owed to Malaysia and were required to have been paid by Mark Burnett's Survivor Entertainment Group or CBS before the production left Malaysia, Richard erroneously filed his United States tax return without including the $1M winnings not realizing they should have been included and reduced any tax obligation to zero by taking a Foreign Tax Credit (FTC). Richard mistakenly believed the return he filed most accurately reflected his tax status at the time with respect to the United States.

In 2004, Richard was charged with attempting to evade taxes and, since willfulness is required for Richard to have broken the law, Richard refused to plead guilty. The Government dropped the charge and, eight months later in an attempt to coerce Richard to plead guilty, then charged Richard with attempting to evade taxes and bank fraud, wire fraud, charity fraud, etc., a

4

total of 10 counts. Richard again refused to plead guilty knowing he had not willfully violated any law.

Apparently, original presiding Judge Ernest Torres had been scheduled to retire but held off his retirement to adjudicate Richard's very public tax evasion case which eventually went to trial in January 2006. During *voir dire*, Judge Torres denied Richard's request to question jurors with respect to potential prejudices/biases despite prospective jurors having referred to Richard, in written responses to a questionnaire, as a "homo," "queer," and "faggot." Richard was acquitted of eight counts, all but the tax charges. Judge Torres then contradicted the jury's findings by falsely claiming Richard perjured himself and sentenced Richard to 51 months in prison, including additional years for wrongfully-alleged perjury.

Additionally, without any assessment of Richard's taxes ever having been paid, Judge Torres imposed two special conditions to Richard's sentence, both of which were beyond Judge Torres' purview and with which it was literally impossible for Richard, on his own, to comply. First, Judge Torres ordered Richard to amend his 2000 and 2001 tax returns and to pay all taxes purportedly owed. Second, Judge Torres ordered Richard to receive mental health treatment. The Government chose and hired a psychiatrist who evaluated Richard, pointed out Judge Torres had overstepped his bounds, and determined Richard needed no mental health treatment.

As background demonstrating where Judge Torres' hostility towards Richard originated, sometime in 2003/04 before any of the above-referenced tax issues arose, Richard successfully brought Judge Torres before the Board of Judicial Tenure and the Board admonished Judge Torres for having overstepped his bounds with respect to Richard in a previous and unrelated matter. As demonstrated in the history above, notwithstanding the admonition, Judge Torres continued to harass and overreach onto Richard's rights.

Meanwhile, understanding that amending a complicated tax return was well-beyond Richard's capability and Richard had already been sent to prison ostensibly for doing his best to file an accurate tax return, Richard engaged an accountant and an attorney to assist him with the process of complying with Judge Torres' order to amend Richard's tax returns. To this end, Richard and his accountant repeatedly met with the IRS, and the IRS formally acknowledged in writing their gratitude for Richard's cooperation.

Nevertheless, the Government falsely claimed Richard was violating his probation by not amending his tax return and Judge Smith (Judge Torres' successor) ignored the fact that Judge Torres' order contained neither any instruction as to how Richard's tax returns should be amended (because no assessment had ever been made) nor any deadline by which Richard was required to amend his tax returns. Judge Smith also appears to have ignored Richard's good faith efforts to amend his tax returns by engaging an accountant and attorney and fully cooperating with the IRS in efforts to amend the returns. Eventually, the IRS supervisory agent with whom Richard and his accountant were working concluded taxes were owed to Malaysia, and she paused or discontinued efforts to amend Richard's tax returns until such time as the United States Tax Court could adjudicate the issue.

Under the circumstances, Judge Smith erred in finding Richard guilty of violating his probation and Judge Smith's biases were exposed when he sentenced Richard to 9 additional months in prison (when even the Government had requested Richard only serve 6 months) for not amending tax returns literally impossible for Richard, himself, to have amended and despite Richard's full cooperation with all efforts to do so. Judge Torres' special condition ordering Richard to amend his tax return without any deadline, without instructions as to how said tax return must be amended, and for Richard to do so while ignoring the input and guidance from his

accountant, attorney, and the IRS is akin to having ordered Richard to submit accurate architectural plans to construct a new hospital and expecting he do so without input from architects. On its face, Judge Torres' special condition was incomplete, improper, and one with which it was impossible for Richard to comply. Yet still, Richard diligently attempted to do everything possible in an effort to comply while seeking additional guidance from his Probation Officer and keeping that Probation Officer fully informed of ongoing efforts.

Since income tax on Richard's $1M winnings was owed to Malaysia, the IRS could not and did not assess Richard to owe any tax until sometime in 2010 (four years after Richard had been wrongfully convicted and sent to prison), and the IRS incorrectly theorized (or intentionally withheld from the Court) the statute of limitations had expired for Richard to claim the Foreign Tax Credit (FTC) to which, for the first time in C.A. No. 22-332 WES filings, the Government is on record admitting Richard was entitled for taxes on the $1M winnings paid to Malaysia.

On April 10, 2010, the IRS filed a Notice of Federal Tax Lien "against all property and rights to property" belonging to Richard for what they claimed were the unpaid federal income tax liabilities they had just assessed. Simultaneously, the IRS wrongfully issued Kristin (Richard's sister) a Notice of Federal Tax Lien, as Richard's nominee, transferee, or alter ego. The Notice issued to Kristin identified 21 and 23 Annandale Road as properties to which the IRS falsely claimed the tax liens attached. These liens, without any justifiable basis, would later be repeatedly released and then reinstated, and then superseded by other liens. The IRS has maintained these unjustified liens now for more than 15 years causing grave harm to Richard and to Kristin. By falsely claiming Kristin's assets were Richard's, the IRS has prevented Richard from retaining income he could have used to pay any tax obligations. In conjunction with Judge Smith's having twice prevented Richard from engaging two specific work opportunities from

each of which Richard may have earned much more than the Government, at the time, was

alleging Richard owed in taxes, the IRS's obfuscation, dissembling, and prevarication have

caused Richard's alleged tax obligation to balloon to nearly $4 million.

Now, this Court's most recent Amended Memorandum and Order contains numerous

factual errors and poetic flourishes that ignore the foregoing facts and are indicative of the

Court's apparent prejudice and lack of objectivity toward Richard. These include:

> 1. The Court writes, "And the golden goose kept giving, as [Richard's] newfound fame brought him more financial opportunities over the next few years." In fact, and despite the inapt analogy, Richard's Survivor win would most certainly have brought him tremendous financial success had prevailing prejudices and biases not devastated his life. The Court's choice of words is telling in the context of ostensibly having just realized and ruled that the IRS has been abusively misguided in its efforts to punish Richard for more than 15 years. One would have hoped (and expected) the Court, as an objective reviewer of the facts, would have taken a second look at its own rulings and their origins in the context of having learned how the powerful organization pursuing Richard had been misusing its power.
>
> 2. The Court makes clear it is ignoring the facts, writing, "[Richard] had fully transferred both the 21 and 23 Annandale properties to Ms. Hatch because he could no longer afford to keep them." In fact, Richard ***never paid a cent*** toward his sister's purchase of 23 Annandale, acted only as a co-signer under the guidance and instruction of Kristin's broker/lender and attorney, and transferred the property to Kristin because the property all-along belonged to her.
>
> 3. The Court completely ignores the facts by describing as "dilatory conduct" Richard having informed the IRS he won the $1M, having provided the IRS with his correct social security number when they had no idea he had won the $1M, having reached out to the IRS for guidance with respect to determining if any tax on his $1M winnings was owed to the United States, and always fully cooperating with the IRS. This Court, in this same Order in which it describes Richard's conduct as dilatory, seemingly and contrastingly rules that the definitive dilatory conduct *of the IRS* prevents *it* from prevailing in its efforts to punish Richard. In fact, the IRS' indisputable and intentional dilatory conduct, rooted in its

knowledge, all along, that Malaysia (and not the United States) was entitled to the income tax on Richard's $1M winnings, prevented Richard from receiving the assessment of his tax obligations for more than 10 years because the IRS knew all along and withheld from the Court (until 2025) that income taxes on the $1M winnings were owed to Malaysia.

4. On Page 3, the Court falsely claims, "[Richard] did not comply" with respect to Judge Torres' special condition when the simple facts are clear and indisputable that Richard was fully cooperating with the IRS and doing everything possible to comply with Judge Torres' order.

Under the circumstances, allowing the Order granting summary judgment against Richard will result in obvious and prolonged (by decades) manifest injustice to Richard's interests. It is quintessentially the very definition of being "railroaded." The injustice cannot be allowed to continue.

### B. American Law Does Not Support Application of the Income Tax to Richard's Private Earnings.

As a nonlawyer without the financial resources (due to the last 25 year debacle to his finances of the Government's making) to be able to hire legal counsel to represent his interests, Richard has not had the skills and legal training to advance legal arguments supporting his position and, therefore, requests that the Court exercise its broad discretion to fully consider the legal arguments advanced by Richard below in granting relief. To do less would result in manifest injustice.

The authorities below, beginning with the very recent 2024 U.S. Supreme Court decision in *Moore v. United States*, 602 U.S. 572, 582, 144 S. Ct. 1680, 1687, 219 L. Ed. 2d 275 (2024), completely substantiate Richard's position that his private earnings, including the $1M Survivor prize money, are unequivocally *not* subject to the federal income tax.

### i.    The Federal Income Tax Is and Always Has Been an Indirect, Excise Tax of Limited Application.

The income tax laws are not intended to tax the private earnings of *all* American citizens, regardless of how derived. To suggest otherwise is to imply that the federal income tax is a ***direct tax*** on all Americans, a *per capita* tax on every head in the country regardless of the nature and source of the income, and that there are no persons exempt from the income tax in America. This is patently incorrect and inconsistent with the nation's storied history of passage and application of the revenue laws.

There is no dispute that the federal income tax is not a direct tax but an ***indirect or excise tax***. The powers enumerated in the Constitution give Congress broad authority to impose either a *direct tax*, requiring apportionment and enumeration pursuant to Article 1, Section 9, or an *indirect or excise tax*, subject to uniformity pursuant to Article 1, Section 8.

In the long history of the income tax, it has never effectively been, nor indeed can be without a constitutionally authorized Act of Congress apportioning the tax subject to enumeration, imposed as a direct tax. Pointing out that direct taxes are difficult to enact, the U.S. Supreme Court has identified that ***there are <u>no apportioned direct taxes</u> in the current Internal Revenue Code*** and that Congress has not enacted an Article 1, Section 9 apportioned and enumerated tax since the Civil War:

> Article I of the Constitution affords Congress broad "Power To lay and collect Taxes, Duties, Imposts and Excises." Art. I, § 8, cl. 1. That power includes ***" 'two great classes of' " taxes—direct taxes and indirect taxes.*** *Brushaber v. Union Pacific R. Co.*, 240 U.S. 1, 13, 36 S.Ct. 236, 60 L.Ed. 493 (1916).
>
> Generally speaking, *direct* [emphasis in original] taxes are those taxes ***imposed on persons or property***. See *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 570–571, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). As a practical matter, however, ***Congress has rarely enacted direct taxes because the Constitution requires that direct taxes be***

*apportioned among the States*. To be apportioned, direct taxes must be imposed "in Proportion to the Census of Enumeration." U. S. Const., Art. I, § 9, cl. 4; see also § 2, cl. 3. In other words, *direct taxes must be apportioned among the States according to each State's population*.

So if Congress imposed a property tax on every American homeowner, the citizens of a State with five percent of the population would pay five percent of the total property tax, even if the value of their combined property added up to only three percent of the total value of homes in the United States. To pay five percent, the tax rate on the citizens of that State would need to be substantially higher than the tax rate in a neighboring State with the same population but more valuable homes.

*To state the obvious, that kind of complicated and politically unpalatable result has made direct taxes difficult to enact*. Indeed, the parties have cited **no apportioned direct taxes in the current Internal Revenue Code, and it appears that Congress has not enacted an apportioned tax since the Civil War.** See 12 Stat. 297; E. Jensen, The Taxing Power: A Reference Guide to the United States Constitution 89 (2005).

[*Moore v. United States*, 602 U.S. 572, 582, 144 S. Ct. 1680, 1687, 219 L. Ed. 2d 275 (2024) (emphasis added except as noted.)]

Instead, it is settled US law that the federal income tax is and always has been an indirect tax or an excise tax:

By contrast, *indirect* [emphasis in original] taxes are the familiar federal taxes imposed on activities or transactions. That category of taxes *includes duties, imposts, and excise taxes, as well as income taxes*. U. S. Const., Art. I, § 8, cl. 1; Amdt. 16. Under the Constitution, indirect taxes must "be uniform throughout the United States." Art. I, § 8, cl. 1. A " 'tax is uniform when it operates with the same force and effect in every place where the subject of it is found.' " *United States v. Ptasynski*, 462 U.S. 74, 82, 103 S.Ct. 2239, 76 L.Ed.2d 427 (1983).

Because **income taxes are indirect taxes***, they are permitted under Article I, § 8 without apportionment*. As this Court has said, Article I, § 8's grant of taxing power "is exhaustive," meaning that it could "never" reasonably be "questioned from the" Founding that it included the power "to lay and collect income taxes." *Brushaber*, 240 U.S. at 12–13, 36 S.Ct. 236. *In 1861, Congress enacted the Nation's first unapportioned income tax.* 12 Stat. 309. **The Civil War income tax was recognized as an indirect tax "under the head of excises, duties and imposts."** *Brushaber*, 240 U.S. at 15, 36 S.Ct. 236; see also *Springer v. United States*, 102 U.S. 586, 598, 602, 26 L.Ed. 253 (1881).

11

In 1895, however, in *Pollock v. Farmers' Loan & Trust Co.*, this Court held that a tax on income from property equated to a tax on the property itself, and thus was a direct tax that had to be apportioned among the States. 158 U.S. 601, 627–628, 15 S.Ct. 912, 39 L.Ed. 1108. The *Pollock* decision sparked significant confusion and controversy throughout the United States.

Congress and the States responded to *Pollock* by approving a new constitutional amendment. Ratified in 1913, the Sixteenth Amendment rejected *Pollock*'s conflation of (i) income from property and (ii) the property itself. The Amendment provides: "The Congress shall have power to lay and collect taxes on incomes, *from whatever source derived* [emphasis in original] without apportionment among the several States, and without regard to any census or enumeration." U. S. Const., Amdt. 16 (emphasis added).

Therefore, the Sixteenth Amendment expressly confirmed what had been the understanding of the Constitution before *Pollock*: **Taxes on income** – including taxes on income from property – **are indirect taxes** that need not be apportioned. *Brushaber*, 240 U.S. at 15, 18, 36 S.Ct. 236. Meanwhile, property taxes remain direct taxes that must be apportioned. See *Helvering v. Independent Life Ins. Co.*, 292 U.S. 371, 378–379, 54 S.Ct. 758, 78 L.Ed. 1311 (1934).

[*Moore v. United States*, 602 U.S. 572, 582–84, 144 S. Ct. 1680, 1687–88, 219 L. Ed. 2d 275 (2024) (emphasis added except as noted).]

Thus, the federal income tax is not a direct tax that applies broadly to simply every head in America, but an indirect excise tax of limited applicability.

## ii. Federal Law Recognizes that an Indirect or Excise Tax is a "Privilege" Tax.

There is no dispute under federal law that an excise tax is a privilege tax extending only to certain specified transactions or privileges:

The essence of [the] tax [under review] is that it is triggered by a specific event – a property transfer. Thus, it resembles the excise tax rejected by the Supreme Court in *County of Yakima* [*v. Confederated Tribes & Bands of the Yakima Indian Nation,* 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992)] as much as, if not more than, the ad valorem tax that the Court condoned. In particular, we can discern quite a bit about this tax by acknowledging that it only arises as a result of a sale or transfer of land,

12

and, in particular, a transfer to a specific type of owner, i.e., a tax-exempt entity.

Only by exercising its privilege to transfer this land to an owner of its choice does the Quinault Nation incur any tax. The fact that the tax is *triggered by the property owner's decision represents the quintessential example of an excise tax: "a tax imposed on* **the performance of an act ... or the enjoyment of a privilege."** *Black's Law Dictionary* 563 (6th ed.1990); *see Black v. State,* 67 Wash.2d 97, 406 P.2d 761, 762 (1965) (***"the obligation to pay an excise tax is based upon the voluntary action of the person taxed in performing the act"***) (citation omitted).

[*Quinault Indian Nation v. Grays Harbor Cnty.*, 310 F.3d 645, 651 (9th Cir. 2002) (emphasis added).]

(See also *United States v. 4,432 Mastercases of Cigarettes, More Or Less*, 448 F.3d 1168, 1185 (9th Cir. 2006) ("An excise tax…is one "imposed on the performance of an act ... or the enjoyment of a privilege." (Citing *Quinault Indian Nation*).)

    **iii.**    **The Legislative History of the Federal Revenue Laws Since 1862 Clearly Establishes the Income Tax as a Tax on the Privilege of Employment in the Public Sector.**

The legislative history of passage and application of the revenue laws under Congress' broad taxing authority since 1862 clearly establishes that the federal income tax is intended to apply to and be collected exclusively from "income taxpayers," those identified by the various revenue laws as holding privileged positions of deriving income from employment in the public sector, not a direct tax on ordinary citizens having no dealings with the government. The iterations of the various income tax acts over time make clear that its application is limited to government workers – from the 1862 passage of the Revenue Act (which first established the office of the Commissioner of Internal Revenue), through the first Internal Revenue Code publication in 1939, to the 1954 and current version of the IRC – and expanded to state government workers with the passage of the Public Salary Tax Act of 1939 relating to taxation of the compensation of "public officers and employees".

13

The Revenue Act of 1862 (July 1, 1862, Ch. 119, 12 Stat. 432), was a bill the United States Congress passed to help fund the American Civil War. President Abraham Lincoln signed the act into law on July 1, 1862. The act established the office of the Commissioner of Internal Revenue, a department in charge of the collection of taxes, and levied excise taxes on most items consumed and traded in the United States.

> The first act of Congress imposing a tax or duty on incomes was that approved August 5, 1861 (12 Stat. L., p. 309, secs. 49, 50, 51). This was amended by the act approved July 1, 1862 (12 Stat. L., p. 472, sec. 89, et seq.), which is always referred to as the "income tax law."

> [*Galm v. United States*, 39 Ct. Cl. 55, 56 (1903).]

The Revenue Act was dubbed *"An Act to provide Internal Revenue to support the Government and to pay Interest on the Public Debt"*, and, per Section 86, titled "SALARIES AND PAY OF OFFICERS AND PERSONS IN THE SERVICE OF THE UNITED STATES, AND PASSPORTS", limited application of the income tax to public employment:

> …there shall be levied, collected, and paid on all salaries of **officers**, or payments to **persons in the civil, military, naval, or other employment or service of the United States**, including senators and representatives and delegates in Congress, when exceeding the rate of six hundred dollars per annum, a duty of three per centum on the excess above the said six hundred dollars…."

> [12 Stat. L., 472 (emphasis added); see also *Galm v. United States* at 60.]

Subsequent enactments reinforced the limitation of the income tax to apply to the salaries or compensation paid to persons in employment or service of the United States. The United States Revenue Act of 1921 (ch. 136, 42 Stat. 227, November 23, 1921) defined "gross income" and provided representative examples of those in public service, and therefore subject to the income tax, as follows:

> … "gross income" [i]ncludes gains, profits, and income derived from salaries, wages, or compensation for personal service (including in the

14

case of ***the President of the United States, the judges of the Supreme and inferior courts of the United States, and all other officers and employees, whether elected or appointed***, of the United States, Alaska, Hawaii, or any political subdivision thereof, or the District of Columbia, the compensation received as such)…."

[42 Stat. 227, Sec. 213(a) (emphasis added).]

The Public Salary Tax Act of 1939 (H.R. 3790, 76th Congress, 1st Session, February 21, 1939) ambitiously expanded the application of the federal income tax to include state public employees:

Section 22 (a) of the Revenue Act of 1938 (relating to the definition of "gross income") is amended by inserting after the words "compensation for personal service" the following: ("including personal service as an ***officer or employee of a State, or any political subdivision thereof***, or any agency or instrumentality of any one or more of the foregoing)".

[Public Salary Tax Act, Title 1, Sec. 1 (emphasis added).]

Notably, 26 USC 3401(c) defines "employee" as including "an ***officer, employee, or elected official of the United States, a State, or any political subdivision thereof, or the District of Columbia***, or any agency or instrumentality of any one or more of the foregoing. …" (Emphasis added.)

Although subsequent pronouncements of the income tax have increasingly over time obfuscated or altogether abandoned references to "public officers and employees", the preamble to the 1939 Internal Revenue Code definitively placed its Legislative History as having "its ultimate origin in 164 separate enactments of Congress" – necessarily including its limited application to federal incomes – hailing back to the original Revenue Act of 1862.

The whole body of Internal Revenue Law in effect on January 2, 1939, therefore, has its ultimate origin in 164 separate enactments of Congress. The earliest of these was approved July 1, 1862….

[Preface, p. iii, United States Statutes at Large, Vol. 53, Part 1, *Internal Revenue Code*, Feb. 10, 1939.]

15

And to eliminate any doubt, a 1992 Congressional Joint Committee on Taxation report resulted in publication of a comprehensive derivation table tying the origins of the Internal Revenue Code to the prior income tax enactments.

> [This] pamphlet is intended to consolidate into one volume the derivations of the 1939 and 1954 Internal Revenue Codes for benefit of tax law researchers.
>
> [Introduction, p. 1, *Derivations of Code Sections of the Internal Revenue Codes of 1939 and 1954*, Joint Committee on Taxation, Jan. 21, 1992.]

Thus, there is no escaping the fact that the Internal Revenue Code and its imposition of the income tax applies *only* to incomes derived from employment in service of a public office. Nor has the income tax somehow expanded or transformed over time by legislative fiat without public notice into a *direct tax* with broad and general application to ordinary citizens having no government-connected income.

### iv.   Richard's Private Earnings Are Not Connected to any Employment in the Public Sector.

The foregoing authorities establish that working for the state or federal government in furtherance of a public office is deemed, at least by Congress and the Courts in over 160 years of revenue law enactments and precedence, a *privilege* under American law. It is a voluntary act performed by the person taxed in performing the prescribed act – working in the public interest. (*Quinault Indian Nation*, 310 F.3d at 651.) As a result, the public employee is properly subject to the income tax.

Richard does not contest – nor ever has contested – the lawful power of Congress to lay and collect the federal income tax under the Constitution. On the contrary, the income tax is a proper means of taxing income derived from certain privileged activities limited to carrying on a public office, which if Richard had engaged in such activities, should properly apply to any

income he derived from the activity. Those who benefit from the privilege of serving in the interests of a public office by which they derive income from their special positioning *should* be taxed on the gains.

However, Richard ***does not*** fall within any such privileged class. Other than serving honorably for 5 years from 1980-1985 in the United States Army (including serving on the United States Military Academy's Honor Board as a plebe, a rare distinction for any first-year student), Richard is not now, nor ever otherwise has been, a state or federal employee. He is a private individual and does not hold, nor ever has held, public office, nor has ever derived income from any such activity. To the extent that he ever voluntarily paid taxation demanded, requested, suggested, or recommended by the IRS or any state taxing authority in his adult working life, he did so in error on the uninformed and mistaken notion that he duly and properly owed the tax, as though he were a public servant or employee. Any such past sins and errors on Richard's part were before he came to the knowledge of the body of law and authorities cited herein, establishing his freedom from the income tax.

Further, Richard renounces any such past erroneous conduct on grounds of mistaken prior understanding of his legal standing and rights. Richard further will never in the future assume employment in the public sector or assume a state or federal public office, any earnings from which would properly be subject to the income tax, without coincidingly paying the income tax.

v.     **Richard's Private Labor and Earnings Are *Inalienable Rights*, Not Privileges, and Not Subject to the Federal Excise Tax on Income.**

In contrast to public employees exercising the ***privilege*** to work for government, working in the private – removed from the public sector – in one's chosen calling or vocation and earning a living as a result is ***<u>an inherent personal property right</u>*** that cannot properly be subjected to the excise income tax.

The Founding Fathers recognized that, by virtue of Richard's existence as a natural living man, he is endowed by "the Creator" with certain inalienable rights, among which are rights to life, liberty and the pursuit of happiness. These rights are not derived from any act of Congress, nor do they require permission of the state to exercise them, nor can they be properly regulated by taxation without consent. They are inseparable from Richard and are inherent in his very nature.

> As in our intercourse with our fellow-men certain principles of morality are assumed to exist, without which society would be impossible, so certain *inherent rights* lie at the foundation of all action, and upon a recognition of them alone can free institutions be maintained. These inherent rights have never been more happily expressed than in the declaration of independence, that new evangel of liberty to the people: 'We hold these truths to be self-evident' – that is, so plain that their truth is recognized upon their mere statement – 'that all men are endowed' – not by edicts of emperors, or deerees of parliament, or acts of congress, but 'by *their Creator* with certain inalienable rights.' – that is, *rights which cannot be bartered away, or given away, or taken away*, except in punishment of crime – 'and that among these are life, liberty, and the pursuit of happiness; and to secure these' – not grant them, but secure them-'governments are instituted among men, deriving their just powers from the consent of the governed.'
>
> [*Butchers' Union Slaughter-House & Live-Stock Landing Co. v. Crescent City Live-Stock Landing & Slaughter-House Co.*, 111 U.S. 746, 756–57, 4 S. Ct. 652, 660, 28 L. Ed. 585 (1884) (Justice Field, concurring) (emphasis added).]

There is no greater expression of Richard's inalienable right to "pursue happiness" than to be secure in his labor – the most sacred and inviolable property right, and the original foundation of all other property rights.

> Among these inalienable rights, as proclaimed in that great document, is the right of men to pursue their happiness, by which is meant *the right to pursue any lawful business or vocation*, in any manner not inconsistent with the equal rights of others, which may increase their prosperity or develop their faculties, so as to give to them their highest enjoyment. The *common business and callings of life, the ordinary trades and pursuits*, which are innocuous in themselves, and have been followed in all

communities from time immemorial, must therefore be free in this country to all alike upon the same conditions. The right to pursue them, ***without let or hinderance***, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright. It has been well said that ***'the property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable.*** The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper.' Smith, Wealth Nat. bk. 1, *c.* 10.

[*Butchers' Union Co.*, at 757 (emphasis added).]

This property right extends to the conduct of Richard's private affairs, business, or occupation as well as private contracting (also protected by the Contracts Clause of Article 1, Section 10) for the acquisition of property, including private earnings derived therefrom.

Included in the right of personal liberty and the right of private property – partaking of the nature of each – is **the right to make contracts for the acquisition of property**. Chief among such contracts is that of **personal employment, by which labor and other services are exchanged for money or other forms of property**. If this right be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense. The right is as essential to the laborer as to the capitalist, to the poor as to the rich; for the vast majority of persons have no other honest way to begin to acquire property, save by working for money.

[*Coppage v. State of Kansas*, 236 U.S. 1, 14, 35 S. Ct. 240, 243, 59 L. Ed. 441 (1915), *overruled on other grounds by Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 61 S. Ct. 845, 85 L. Ed. 1271 (1941) (emphasis added).]

In short, the inalienable right to be secure in his personal property applies to all of Richard's property interests – earnings, revenue, capital, securities, investments, profits, royalties, dividends, distributions, interest, and other gains derived from private labor, from the

19

use of private property, or otherwise derived from private (non-public) sources – including Richard's use and enjoyment of them. The Government, including this Court, may not deprive Richard of these property rights by imposing a tax on them, unless that power to tax falls within a specifically enumerated power vested in the Congress by the Constitution. As demonstrated in the authorities cited herein, the IRC does not attempt to impose such a tax.

      **vi.**      **Application of the Federal Excise Tax on Income Is Limited to Those Deriving Income from Government Work Who Are Properly Qualified as Taxpayers.**

As stated, whether one is a taxpayer is **circumstantial**. If one derives income from the *privileged position of doing business with the federal, state, or local government*, the income is taxable and, consequently, the individual is properly deemed a "taxpayer". On the other hand, if one earns no such income but only private earnings not tied to government work, the earnings are not taxable and, consequently, the individual is properly classified as a *non*taxpayer.

The following line of federal court precedence make Richard's point by establishing that whether one is a taxpayer or a "nontaxpayer" depends on the circumstances. The federal courts have repeatedly upheld the *limited scope* of the revenue laws in cases of overzealous revenue collection officers seizing property of a third party *nontaxpayer* to satisfy the tax liability of a taxpayer. It is a tell revealing that there is such a classification as "nontaxpayer" altogether, depending on the circumstances.

> The revenue laws are a code or system in regulation of tax assessment and collection. ***They relate to taxpayers, and not to nontaxpayers. The latter are without their scope.*** No procedure is prescribed for nontaxpayers, and no attempt is made to annul any of their rights and remedies in due course of law. ***With them Congress does not assume to deal, and they are neither of the subject nor of the object of the revenue laws.***

> [*Long v. Rasmussen*, 281 F. 236, 238 (D. Mont. 1922) (emphasis added).]

20

The doctrine articulated by the *Long* court – that the revenue laws apply only to taxpayers and that nontaxpayers are *outside the scope* of the revenue laws – has consistently been reinforced by the federal courts making it settled U.S. law.

> We agree with the defendant that the ***plaintiffs are not taxpayers*** in this case with respect to these funds ***within the meaning of the revenue laws***….
>
> In support of the foregoing conclusions, we wish to point out and emphasize that Congress has established a well-defined and comprehensive administrative system for the recovery of overpaid taxes by taxpayers. All ***taxpayers*** [EMPHASIS IN ORIGINAL] who have overpaid their taxes are within this system and must follow the appropriate procedures and regulations, including the timely filing of claims for refunds for overpayment of taxes, if they are to have the benefits of the system. On the other hand, persons ***who are not taxpayers*** [EMPHASIS IN ORIGINAL] ***are not within the system and can obtain no benefit by following the procedures prescribed for taxpayers***, such as the filing of claims for refunds. For example, there have been many cases where parties have sued to enjoin the assessment or collection of their moneys to pay the taxes of another, notwithstanding Section 263 of the Internal Revenue Code of 1939 (26 U.S.C. § 3653 (1952 ed.)) that provided that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." The courts have allowed these suits because the parties filing the suits ***were not taxpayers and were outside the revenue system*** of which the above statute is a part. See *Long v. Rasmussen*, 281 F. 236 (D.Mont.1922); *Rothensies v. Ullman*, 110 F.2d 590 (3d Cir. 1940); *Raffaele v. Granger*, 196 F.2d 620 (3d Cir. 1952); and *Bullock v. Latham*, 306 F.2d 45 (2d Cir. 1962). In *Long v. Rasmussen*, the court said:
>
> "They *[the revenue laws] relate to taxpayers, and not to nontaxpayers. The latter are without their scope. No procedure is prescribed for nontaxpayers, and no attempt is made to annul any of their rights and remedies in due course of law*." [*Id*. 281 F. at 238.]
>
> [*Econ. Plumbing & Heating Co. v. United States*, 470 F.2d 585, 588–89 (Ct. Cl. 1972) (emphasis added except as noted).]

See also *Tomlinson v. Smith*, 128 F.2d 808, 811 (7th Cir. 1942) ("In *Long v. Rasmussen*…the court…makes a distinction between suits instituted by taxpayers and non-taxpayers. The former…are within the scope of the [26 U.S.C. § 3653 lawsuit in the courts of law] inhibition,

21

but the latter are not."); *National Iron Bank v. Manning*, 76 F. Supp. 841, 843 (D.N.J. 1948); *Rothensies v. Ullman*, 110 F.2d 590, 592 (3d Cir. 1940) ("We think that [§ 3653] of the Internal Revenue Code…was not intended to deprive the courts of jurisdiction to restrain revenue officers from illegally collecting taxes out of property which does not belong to the person indebted to the government." (Citing *Long v. Rasmussen*); *Raffaele v. Granger*, 196 F.2d 620, 623 (3d Cir. 1952) ("This court and others have consistently held that Section 3653(a) of Title 26 does not prevent judicial interposition to prevent a Collector from taking the property of one person to satisfy the tax obligation of another." (Citing *Rothensies v. Ullman*, *Glenn v. American Surety Co.*, 160 F.2d 977 (6 Cir., 1947); *Long v. Rasmussen*).); and *Bullock v. Latham*, 306 F.2d 45, 46 (2d Cir. 1962).

Thus, the income tax applies circumstantially depending on whether an individual derives income from the privilege of holding some federal, state, or local office or who is otherwise engaged in some form of government work, as established in by the authorities cited in the prior sections above. These individuals are the taxpayers to whom the income tax legally, lawfully, and properly applies. Richard does not engage in any such *privilege*. Instead, all Richard's earnings are derived from the free exercise of his ***inherent rights***, including labor – his most sacred and inviolable property right. Thus, Richard's earnings 25 years ago from being the first Survivor competition victor are not taxable as income within the meaning of the revenue laws. Richard is properly qualified as a nontaxpayer.

### III.    CONCLUSION

For the foregoing reasons and in the interests of preventing grave and manifest injustice as set out above, Richard respectfully requests that the Court reconsider its June 5, 2025, Order granting summary judgment against him on Counts One and Two of the Government's Complaint, and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,                                  Dated: July 2, 2025

/s/ Richard H. Hatch, Jr.
Richard H. Hatch, Jr.- *Pro Se*
hatchrich@gmail.com
11 Lowndes Street
Newport, RI 02840
401-714-1230

**Certificate of Service**

I hereby certify that on July 2, 2025, a true and correct copy of the foregoing was served on all counsel of record by email.

_____
Richard H. Hatch, Jr.