IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * * *    C.A. No.  1:22-cv-00332-WES
                         *
UNITED STATES OF AMERICA  *
                         *
      VS.                *    MARCH 6, 2025
                         *
RICHARD H. HATCH, JR.,    *
et al.                   *
                         *    VIA VIDEOCONFERENCE
* * * * * * * * * * * * * *    PROVIDENCE, RHODE ISLAND
```

BEFORE THE HONORABLE WILLIAM E. SMITH,

DISTRICT JUDGE

Oral argument


APPEARANCES:

FOR THE PLAINTIFF:     CURTIS CLAYTON PAUL, AUSA
                       DEPARTMENT OF JUSTICE - TAX
                       P.O. Box 55
                       Washington D.C., DC  20044

FOR THE DEFENDANT:     GERARD J. LEVINS, ESQUIRE
                       LEVINS TAX LAW, LLC
                       1671 Worcester Road, Suite 304
                       Framingham, MA  01701


ALSO PRESENT:  RICHARD HATCH, Pro Se


Court Reporter:        Denise A. Webb, RPR
                       One Exchange Terrace
                       Providence, RI  02903

VIA VIDEOCONFERENCE

06 MARCH 2025

THE COURT:  Good morning, everyone.  We're here in the matter of the United States versus Richard Hatch, and we're here on the Government's objection to Magistrate Judge Almond's report and recommendation.  This is Action Number 22-332.  The Government asks for oral argument on its objection for 20 minutes.  I'm going to hold you to that 20 minutes.

So let's have everybody identify themselves for the record.  And, then, Mr. Paul, you can proceed with your argument.

MR. PAUL:  Thank you, your Honor.  Curtis Paul for the United States.

THE COURT:  Mr. Levins, you're on mute.

MR. LEVINS:  Sorry, your Honor.  Your Honor, Gerard J. Levins, counsel for Defendant/Counterclaim Plaintiff, Kristen Hatch.

MR. HATCH:  I think I was on mute too.  Richard Hatch.

THE COURT:  All right.  Thank you.  Mr. Paul.

MR. PAUL:  Thank you, your Honor.  So the United States objected to Judge Almond's report and recommendation for three reasons.  Primarily, however, the main reason is that Judge Almond got the facts right here but the law

wrong.  Judge Almond correctly found that the totality of the evidence here is suggestive of fraud but failed to correctly apply the law of fraudulent transfer.

There are two other reasons, which were raised in the objection.  The second is that there is no analysis in the R and R of the United States' theories for constructive fraud or for resulting trust as to 23 Annandale, so either way the Court will have to engage with those areas.

And in the final reason, which is related to this, is that Magistrate Judge Almond states that there is intention here between the Seventh Amendment, right to a jury trial, and Rule 56, because Kristen has demanded a jury trial, but none of the issues in Count 2 guarantee a jury trial, as they're all equitable in nature.

I do want to focus on why the Court can grant summary judgment from the United States on fraudulent transfer for both of these properties.  So Magistrate Judge Almond correctly found here that these are intra-family transfers, they're not arm's length, there is no evidence of a sales price for either property, and there's no record of consideration exchanged.

Mr. Hatch, he continues to live at 21 Annandale.  He was heavily involved in the renovation and the rental of 23 Annandale before and after these transfers, and most importantly, which I believe should be given significant

weight here is that Mr. Hatch transferred his interest in these properties after the 2000 and 2001 tax years when he was either under active tax examination or criminal investigation for attempted tax evasion.  I cannot emphasize enough that he transferred 21 Annandale in 2005 to his sister Kristen after the criminal information was filed but prior to his indictment.

And the totality of all of these facts, these badges of fraud, as Judge Almond correctly put it, are plainly suggestive of fraud.

Now, the law of fraudulent transfer under Rhode Island's Uniform Voidable Transfer Act and First Circuit precedent are that when there is a confluence of badges of fraud, it creates a rebuttable presumption of actual fraudulent intent, and if that presumption is not rebutted, the transfer is deemed fraudulent for the benefit of creditors.

Furthermore, also under the UVTA, a transfer can be constructively fraudulent if the debtor transfers the assets without receiving equivalent value either when they are insolvent or if they reasonably believed that they would incur debts beyond their ability to pay as they came due.

So the Court can resolve Count 2 on Magistrate Judge Almond's factual findings but by a correct application of the UVTA and First Circuit precedent.

THE COURT:  Can I just ask you a question, because I think this is something that we're a little bit confused about, is this issue of whether there was consideration or not consideration with respect to these mortgages.  If I understand it correctly, I think you say that there was no consideration, and I think the Hatches argue that after this transfer, there was a refinancing and then the refinancing discharged the mortgage.

So why wouldn't that, if that's true -- and I'm not sure I understand the details of that, but if that's true, if a jury were to find that, let's say, would that be consideration or why wouldn't that be consideration if one had a mortgage -- the city had a mortgage on the property for a hundred thousand dollars and then that was discharged as a result of the purchaser refinancing?  Why isn't that consideration?

MR. PAUL:  So I'm happy to address that, your Honor.  So the issue of the refinance deals with only one of the properties here, and that is 21 Annandale.  So in 2005, between the time of the criminal information and the indictment, the property was, first, one-half interest transferred to Kristen and then the second half interest transferred to Kristen.  That happened in May 2005.  Very shortly thereafter, Kristen did then refinance the existing mortgages on the property.

Now, the reason that this is not consideration here, even if the Court wants to view it as consideration, it's not reasonably equivalent to the value of the property.  And here's why:  So the value of the refinance was roughly $359,000.  This was the three mortgages that were in Richard's name on the property.  The refinance application that Kristen used to obtain a refinance lists that same property that she received as collateral, as an asset to obtain that.  So she took the property with those mortgages on it.  It wasn't given in exchange for the transfer.

But, more importantly, on the refinance application, the listed value of 21 Annandale at the time in 2005 was $620,000, which is almost double the amount of the refinance.

Now, I do want to point out, in Magistrate Judge Almond's report and recommendation, it does say that there's no evidence of consideration and does mention later on that the United States has failed to show there are no triable issues, but it doesn't specifically say whether that issue is consideration.  And so in my view, the consideration is not an issue here for both of these properties.

And I'd like to mention as well an issue of consideration for 23 Annandale, or at least what Richard and Kristen have said is an issue, is that Kristen paid Richard for this property at some point, and to support this

contention, they have put forward a series of canceled checks.  Magistrate Judge Almond was correct that this sort of trail of canceled checks is confusing, and it's confusing because none of these checks reference the property or reference a down payment for 23 Annandale.  The memo lines in these checks are either blank or reference unrelated matters.  None of the amounts of the checks add up to the down payment for 23 Annandale.  Some of the checks are even dated before the transfer took place.

And I think when that is viewed in light of Kristen's deposition testimony, that she could not recall how 23 Annandale was transferred or how that transaction unfolded, the deposition testimony really does not support what was then later shown these checks to supposedly be consideration for the property.

THE COURT:  Isn't that exactly the problem that Judge Almond was identifying, which is, you know, the argument you just made, in order for me to see that as favorable to the Government's position, I have to draw some inferences in favor of the Government, which is impermissible.  So that, what you just described, sounds like a classic factual dispute about what the purpose of those checks were.  And I can very well see your point that a jury would likely conclude that those checks were not consideration for the property, but I can't make that

inference.  I mean, you asked me just now to draw an inference from Kristen's lack of recollection about what the checks were for that would support the Government's position that they're not consideration.

MR. PAUL:  So the reason that I view the checks as not creating a genuine dispute of material fact here is that they're highly speculative, highly problematic, there's, again, no clear reference to the property on these checks, these are just large sums of money written to Richard after this transfer took place.

THE COURT:  Okay.  But testimony of the two parties would be presumably consistent with deposition testimony or that they were part of the transaction related to the property, and then you cross-examine on that and make all the points you just made, that there's no memo reference, there's no other contemporaneous effort, the numbers don't add up, so forth and so on, and then the jury would make a determination.

I mean, again, I come back to this idea that if feels like you're asking me to draw some inferences in the Government's favor.

MR. PAUL:  So disregarding the deposition testimony, your Honor, when Kristen was asked about 23 Annandale and these checks, and just to be clear, the checks only relate to 23 Annandale --

THE COURT:  Right.

MR. PAUL:  -- she could not recall.  She did not mention at any point in deposition, oh, well, I wrote Richard checks to pay for it.  I didn't understand how it happened.  It wasn't until she was responding to the United States' motion for summary judgment that these checks came up.  They weren't put forth in her affirmative motion for summary judgment and, again, were not mentioned or used as explanation during her deposition.

Now, regarding inferences, I want to emphasize the Uniform Voidable Transactions Act, First Circuit precedent, state that binding actual fraudulent intent is done circumstantially and inferentially.  You look at all of the circumstances surrounding the transfer, and in the case of summary judgment, the absence of evidence as well, and when seeing that in totality, the presumption of fraudulent intent will arise when there is a confluence of badges of fraud.

And, respectfully, there are two cases that I think are really on point here.  First, out of the First Circuit, this is *FDIC V. Anchor Properties*, 13F.3d 27 1994, the First Circuit affirms summary judgment in favor of a creditor from the District Court's finding of fraudulent transfer with evidence that was based on the totality of the circumstances.  That case has been cited and reaffirmed.

The second case I'd like to direct the Court to is *Bank of New York Mellon* at 2019 Westlaw 757 8478 out of the District of Massachusetts.  This case, again, was at summary judgment and actually on report and recommendation.  The central holding and reasoning of these cases, your Honor, is that fraudulent intent is interpreted circumstantially and inferentially and that courts have to rely on these badges and indicators to determine fraudulent intent, because it's often not practicable to prove fraudulent intent on direct evidence.

So some of the most common badges of fraud that the Court will look to at the time of the transfer is whether there was actual or threatened litigation against the debtor, whether the transfer was a substantial amount or all of the debtor's property or assets, whether the debtor was insolvent or had unmanageable indebtedness, whether there's a special relationship between the debtor and transferee, and then whether the debtor retained the property.

Now, not all of these badges have to be completely proven, but a confluence of them can create this circumstantial inference of actual fraudulent intent.  And if they are present and given enough weight, that is the result.

And I would like to say that the issue of consideration, even if the Court views an issue here, that

it could look to the other badges, such as the close relationship between Richard and Kristen and, very importantly, the timing of these transfers.

THE COURT:  Okay.  Could you just spend a minute on whether this would be a jury trial or a bench trial?

MR. PAUL:  Yes, your Honor.  And the United States did brief some of this in its objection to the report and recommendation, and I will note here that should the Court deny summary judgment and set this for trial, the United States would intend to move to strike the jury demand.  All of the issues in Count 2 and Kristen's counterclaim are equitable in nature and do not guarantee her to a jury trial, those issues being the fraudulent transfer, issues of nominee, resulting trust, and then Kristen's action to acquire title.

THE COURT:  Is there any case law that supports that?

MR. PAUL:  Yes, your Honor.  And this was primarily addressed in the United States objection to the report and recommendation starting on page 14.  Neither Mr. Hatch nor Ms. Hatch made a response to these in their responses to the United States' objection, so there was no further briefing on it.  But the bulk of it is at ECF87 starting on page 14.

THE COURT:  Okay.  I see that.  All right. Anything else that you want to add here?

MR. PAUL:  Yes, your Honor.  I'd just like to make two final points.  Again, Magistrate Judge Almond did get the facts correct here.  It's really just the application of the UVTA and fraudulent transfer.  But, also, Magistrate Almond did not engage with the United States' theory for constructive fraud.  Constructive fraud can be proven when the debtor transfers the property without reasonably equivalent value in exchange, either when they were insolvent or reasonably expect that they won't be able to pay their debts as they come due.

I want to emphasize for 21 Annandale, Mr. Hatch has admitted that he was aware that he was facing IRS trouble when he transferred this property.  You can see that in his response to the United States' motion for summary judgment at ECF75, page 66, paragraph eight.

So an evaluation of constructive fraud is necessary here, so either way, our position is that the Court should engage with that.

Lastly, I'll say, your Honor, Judge Almond did state in his report and recommendation that the United States had failed to show the absence of any trial worthy issues.  I would just request that if the Court does deny summary judgment to the United States that it clearly state what those trial worthy issues are.

THE COURT:  Okay.  Thank you very much.

MR. PAUL:  Thank you, your Honor.

THE COURT:  All right.  I'll give each of you about, you know, no more than ten minutes to argue. Mr. Levins, do you want to go first?

MR. LEVINS:  Yes, your Honor.  Thank you.  Couple of points with respect to the jury demand trial.  Based on further research and review of the Government's cases, I believe they're correct that this would not be for jury trial but it would be before your Honor.  That's number one.

Number two, based on the report and recommendation, it appears Judge Almond did a thorough review and made some distinct determinations as far as why it would be impossible for the Court to enter summary judgment.  A couple of issues would be the consideration.  And I think you questioned, you know, the refinancing.  You know, I know there's a question with respect to fair market value likely with respect to 21 Annandale.

The one thing that is common, the same real estate attorney handled all the transactions including the mortgage and refinancing, so I believe everything took place basically the same day.  There were quitclaim deeds that didn't have the amount of consideration, but there's no way that the property could be transferred without taking into consideration any liabilities that exist.

So our position is that there was reasonable inadequate

consideration paid with respect to 21, and this is the 2005 transaction.  There is an issue with respect to the mortgage application which Mr. Behan signed on behalf of Kristen that had the value, which I'm not sure where that value came from, but we believe that reasonable and adequate consideration was paid for 21 Annandale.

THE COURT:  Well, if I would agree to believe that point, I mean, Mr. Paul's argument, if I can kind of sort of work off of it, I think would be that even if I were to, as I'm required to, give all -- draw all inferences in favor of the Hatches, the nonmoving parties here, and determine that some consideration was given for the transfer by virtue of the assumption of the mortgages, let's say, that Mr. Paul's argument would be that even if that is true, the amount of that consideration comes nowhere close to the value of the property.  So even if it were true, it's a grossly inadequate consideration.

Now, why wouldn't that be sort of, you know, factually how this would play out in a summary judgment standard?  If I turn out differently, if it goes to trial, I might find either, yes, it's consideration or, no, it's not consideration.  But at a summary judgment stage drawing all inferences in your favor, I think his argument would be, yeah, you know, okay, we'll give you that consideration, it's still grossly inadequate so, therefore, still a badge

of fraud.

MR. LEVINS:  I think that would assume that the $600,000 that was on the mortgage application that was not signed by Kristen is fair market value.  I don't have any evidence that that was the case at the time of the property transfer.  And, you know, we did disclose -- turn that application over as part of discovery, so I became -- we became aware of it, you know, during discovery.  On the face of it, yes, it looks like the fair market value, but there's no evidence to support that on the actual mortgage application.

THE COURT:  There's no appraisal in connection with the mortgage?

MR. LEVINS:  I'm not aware of any appraisal.  I know from my experience, I know banks are interested in some kind of appraisal because of what they're lending, but Mr. Behan, the attorney who's representing the parties, including I'm pretty sure the bank, that they were satisfied.

THE COURT:  I mean, don't we -- you know, it seems like there ought to be some sort of assumption or presumption that the amount of the stated value is correct, because, otherwise, it would -- put your hand down Mr. Hatch, I'll get to you in a minute -- that the amount of the mortgages is correct, because if not, it would

essentially be fraud, it would be mortgage fraud.  So, now, normally, my experience, there's an appraisal, but even if there's not, I mean, this is her mortgage application, right, she's the one saying that its value is $600,000, correct?

MR. LEVINS:  Yes, your Honor.  Expect for that mortgage application was not signed by Kristen Hatch, it was signed by Mr. Behan, and it said, what I recall from the mortgage application, that he had power of attorney, and, in fact, if I remember during his deposition, the power of attorney that he had was effective after that date.

THE COURT:  So if this goes to a trial, are you saying that, you know, I'm going to have to hear evidence from -- about this mortgage and consideration from both Mr. Hatch and Kristen Hatch but also Mr. Behan and maybe, what, the bank?  I mean, how am I going to sort this out is what I'm asking you.

MR. LEVINS:  Well, what I recall from the deposition, Mr. Behan acknowledged that the power of attorney that he had was executed subsequent to this mortgage application.  What I recall is that he also represented the bank, so based on your experience and my experience, obviously, the bank has to get comfortable that, with their lending, that there's adequate fair market value in there.  But there's never been an appraisal produced or

some kind of valuation that this property was worth more than, I suggest, in the $400,000 range.  I know Mr. Paul mentioned that the mortgage was 357, but Kristen at that time had sold property in the same area, and she had adequate funds to pay the difference between -- there were some original mortgages I believe with Citizens Bank, and also there were private mortgages.

So on the HUD statement that I recall, she paid all the existing conventional mortgages that Mr. Richard Hatch had on the property in addition to some private mortgages, so total consideration was somewhere in the neighborhood of $457,000.  But we could not locate any appraisal, and there was no appraisal presented during discovery and the depositions from any of the lenders.

THE COURT:  Okay.  Any other points beyond this consideration point you want to make?

MR. LEVINS:  Yes, your Honor.  Just with respect to 23, 23 Annandale was purchased from a third party, and that was a warranty deed.  And so both Kristen Hatch and Richard Hatch purchased that property, I think it was back in 2002. And then subsequent to that, Richard conveyed his interest to Kristen.  So, you know, I would think that that was fair market value because it's from an unrelated third party.  I understand the Government's position, because you have related parties, and the relationship, that kind of puts a

taint to it.  And --

THE COURT:  Isn't the history there, not the original purchase but the conveyance from Richard to Kristen, isn't that the point?

MR. LEVINS:  It is, your Honor.  I just want to make sure that they both owned it together.  They purchased it from a third party, and the conveyance, again, Kristen took over for -- paid off all the mortgages based on other properties that she had or she would have sold to do that. She wasn't in a position -- somewhere along the line, the Government's position was that how can Kristen afford any of these properties.  And then through detailed examination of her tax returns at the depositions, it showed that the way the tax laws are, she was very capable through the rental income that she received from 2003, '4 and '5 and all the way through 2021, '22, that the rental income sufficed to cover the expenses.  And, more importantly, because of certain tax acts, she was able to take tax losses, which on the surface of the tax (inaudible), how could someone afford it with these losses.  That's just the benefit of what the tax laws were.

Again, we believe there was fair and reasonable consideration paid both for 21 and 23 Annandale at the time of the transactions.

THE COURT:  I guess I'm a little confused by what

you're saying.  Could you just in very simple terms explain to me what on 23, what is it that you say is the consideration for the 50 percent interest that was conveyed?

MR. LEVINS:  Yeah.  Your Honor, I do agree with Mr. Paul.  It's not black and white clear specifically how Kristen paid for that.  I think the Government's argument, from what I recall, is that Mr. Richard Hatch had an account with Morgan Stanley, he had X number of dollars.  And they -- well, I think the argument was, everything came from him, but based on the bank information that we produced, and it may have been Kristen paying Richard for expenses and so it was an offset, like, you know, if I have the right property, it wasn't specifically done in a memo, which, obviously, presents a problem.  But I believe all the documents that we produced, you know, we can show that -- or we have that Kristen clearly had the funds to make the down payment, the 50 percent down payment with respect to the property purchased in 2002.

THE COURT:  But if she had the funds, that's one thing.  But what I'm asking you is, what is the evidence in the record that funds were paid for the 50 percent ownership that was conveyed?  I'm not sure I'm understanding your position as to those -- you know, was there a check?  Was there -- what is it?

MR. LEVINS:  I apologize, your Honor.  I don't

think there was anything -- a direct check that said, okay, we're paying 20 of the $40,000.  But it was indirect evidence from Kristen's accounts that she was paying Richard, and putting the pieces together, it was around the time that there was a down payment made to purchase that property.

THE COURT:  Okay.  All right.  Very good. Mr. Hatch, what do you want to say?

MR. HATCH:  Thank you, Judge.  So many of the facts it seems to me are misinterpreted by Mr. Paul, and a couple of things I think even with Mr. Levins are confusing.  And I'll be very brief, but Kristen bought 23 Annandale herself. She paid every penny herself.  And Chris Behan and Mr. Mello, the banker, asked me to help, and so I did.  All of the checks that have been provided show --

THE COURT:  Wait a second.  If she bought it all herself, why did you have to help?

MR. HATCH:  Because the banker and Mr. Behan suggested that getting financing would be faster and easier if I helped credit-wise, et cetera.  She had bought a house already and sold it, but it was her first house, and this one was for more, so they asked me to assist her financially.

THE COURT:  Okay.

MR. HATCH:  And I did.  I backed it and told them

I'd be happy to however they wanted me to.  But the checks show that she paid -- I never paid one cent of consideration or anything else toward 23 Annandale.  She identified that house in 1999 before I even went on that show and purchased it herself but with me getting a mortgage and doing it.  I understand that looks confusing, but those are the facts.  That's what happened.  I had no interest in the house.  I could have bought it on my own.  She found it, bought it and it has worked out for her -- or had for her.

THE COURT:  But the ownership interest -- maybe I'm not understanding this, but I thought that 23 Annandale, you -- the title shows that you have 50 percent ownership in that property.

MR. HATCH:  Correct.  When they purchased that house, when they did the paperwork, Chris Behan and Mr. Mello asked me to jointly participate in order to support her.  But the documents we've shown you show that he -- that she paid me anything -- she paid the down payment, she paid every penny, she paid every cent of the mortgage.  I never paid one cent of consideration for that property.

And using the Government's argument, they're claiming that she never paid any consideration.  There's no evidence I paid any consideration other than that that you're describing now, that my name was used.  My name was on these

documents for half of it, but that was at the request of Attorney Behan and Paul -- Mr. Mello.  And Attorney Behan knows that.  They're the ones that did it.

THE COURT:  Well, I mean, what you're saying, I just don't -- I mean, it doesn't make any sense.  Okay.  It sounds to me like what happened here is that she bought a property and you participated in that sale as a co-buyer --

MR. HATCH:  Yes.

THE COURT:  -- and signed on to the mortgage to provide the bank extra security.  So you are a co-borrower of the funds that were used to purchase the property. That's, I think, what you're saying.

MR. HATCH:  Correct.  And the --

THE COURT:  And you took the 50 percent ownership in the property as part of that transaction of participating, so now you have 50 percent ownership in the property.

MR. HATCH:  Without having paid a penny of consideration for it.  The banker --

THE COURT:  Maybe so, but then you transferred that 50 percent interest to her, right?

MR. HATCH:  Because she paid for it, yes.  And the banker explained to me that that's what she could do, was that she could transfer it to her name when time enough had passed and there was enough income shown for her to be able

to support it on her own, and that there was no downside to my jointly helping her.  We just did what Kristy and Banker Mello advised us to do in order for her to buy the property. I had no interest in it.  This is all before *Survivor*. There was no -- Mr. Paul's contention that this was while there was an active tax investigation is completely wrong. Nobody --

THE COURT:  You did have interest.  You had a 50 percent interest in it.

MR. HATCH:  In the property, yes.

THE COURT:  Yeah.  And then you transferred that interest after the tax investigation was underway, I mean, right?

MR. HATCH:  No, sir.  No.  The tax investigation never started -- started way after the transfer.

THE COURT:  Well, you conveyed it in 2003, right?

MR. HATCH:  It was 2002, but yes, some time like that.

THE COURT:  The formal investigation didn't start until a little later.  Okay.  Well, all right.  So what else do you want to say?

MR. HATCH:  So that's 23.  And Mr. Paul is correct that I was aware of the tax problems with 21.  I tried to sell 21 Annandale for more than a year, and I could not sell it for what was owed on it.  But his numbers were all wrong,

like the 359, et cetera.  Kristen paid more than $400,000 for it, because that was the total of the mortgages, not 359.  It was more than the current market value of the property, and she had in order recently, not recently, but a year ago, two years ago, whatever, when she was presented with this idea that she hadn't paid full market value, she had an appraisal done by the real estate board supervisor or president, and it showed that she paid full market value for the property.

THE COURT:  So is all that in the record?

MR. HATCH:  The appraisal isn't, I don't think. The retroactive appraisal currently that the Government could have done, if they wanted to know what the property was worth then, the 600 or whatever that was that was put on some application by the banker or Chris Behan is something they were doing in the 2000s I think.  This is speculation. Countrywide Mortgage was involved, and they were sanctioned, and all those problems were part of banking then, but it had nothing to do with Kristen or me or anyone else.

We never could have come up with an appraisal or assessed the value of the property.  This was Chris Behan and the banker putting whatever was there for their reasons. I know the value of the property, the current market value was less than what Kristen paid for it.  She paid a little bit more than full market value because I couldn't sell it

for a year.

THE COURT:  What I want to know is what's in the record.  Maybe Mr. Paul can help on this.  What I understand is the $600,000 figure, I think as Mr. Levins just said, that comes from a mortgage application, and there's no appraisal or any other document that confirms this number.  What you're saying is there's an appraisal out there, a retroactive appraisal, if that's even a thing, I guess maybe it is --

MR. HATCH:  It's easy to do.

THE COURT:  -- but it's not in the record, if I'm hearing this correctly.  So there's no record of that.  And then you just made a suggestion that this mortgage sale is somehow connected to the Countrywide sub prime mortgage scandal of the 2008 time period and that this was an inflated mortgage and that Countrywide was somehow involved.

MR. HATCH:  That was the --

THE COURT:  That's the first I heard of any of that.  Is that in the record?

MR. HATCH:  That's the company that was involved.  It's in the record in the paperwork that --

THE COURT:  Let me ask Mr. Paul.  Mr. Paul, is all that in the record?

MR. PAUL:  Your Honor, so starting with this retroactive appraisal, no, I have not seen any such

retroactive appraisal in the record.

THE COURT:  What about this whole Countrywide business?

MR. PAUL:  I -- no, your Honor, no evidence of Countrywide.  It seems like what Mr. Hatch is saying, as he said, this is speculation, as the Countrywide was wrapped up in some sub prime mortgage scandal, and that's why $620,000 is listed as the market value on the refinance application. There is no contrary evidence to refute that $620,000 figure, your Honor.

THE COURT:  All right.  Mr. Hatch, what else?

MR. HATCH:  Just -- I'd like to emphasize that if the Government did a retroactive appraisal, they could, if they were interested in what the property was actually worth, put that in the record.  We didn't know we needed to. I didn't look for one.  I know that Kristen had had it done. She didn't have it or she would have put it in.  That's it, your Honor.

I know it's confusing, but she paid every penny for both properties.  She isn't somebody who's doing anything wrong, and this is all because of their perceptions of who I am.

THE COURT:  Okay.  What I think this is really about is whether you fraudulently transferred interest in these properties and whether the Government can attach the

properties in order to fulfill your tax liability.  So I don't think it's so much a claim that she did something wrong; this is more a claim that, well, that you and she might have participated in for these fraudulent conveyances.

MR. HATCH:  That reminds me of one point, if I may.

THE COURT:  All right.  Go ahead.

MR. HATCH:  The Government is claiming fraud, and I'd like to point you to the idea -- I guess you brought it up, the idea of my being 50 percent owner on paper of 23, that's the first house.  I understand their argument and your argument there, even though I didn't pay a penny for it; Kristen did, but the paperwork is what you have.

But with both properties, I didn't own anything that the Government could use to pay any taxes.  I was upside down in '21.  Kristen had paid every penny for 23, so it wasn't as if in fraud, as I understand it, anything was trying to be hidden.  The properties were sold, one, because Kristen was buying the first one, and 21 was sold because I had to, not because I was trying to hide anything.  I couldn't afford it.  It wasn't possible for me to hold that property.  Imagine not being able to and expecting me to for 20 something years.  I simply could not afford the property and tried to sell it for more than a year.  She ended up buying it because nobody else did, and she owned the property next door, so it was a good thing for her.

But my point briefly is that the fraud they're claiming from the outset, I think when you look, it doesn't exist. There's nothing there that I was hiding or trying to do anything with a transfer. It's just imaginary.

THE COURT: Okay. The only issue before me right now is the Government's objection to Judge Almond's report and recommendation, which says that or recommends that I deny their motion for summary judgment. So all that is before me is the Government's -- essentially the Government's motion for summary judgment on Count 2.

There's only two outcomes here. One outcome is I grant the Government's motion for summary judgment because I find it satisfied the burden under more of several theories that they advanced, or I end up agreeing with Judge Almond, that there are material facts in dispute and this has to be tried.

And now I'm hearing from Mr. Levins -- and I assume you agree with this, but let's just get it on the record. You agree with him, I suppose, that this is not a jury trial matter, this is a nonjury matter. Would you agree with what Mr. Levins said on that?

MR. HATCH: This does -- being pro se, I have no way to know. I know Kristen would prefer a jury trial, but I don't know what the legal --

THE COURT: Mr. Levins represents Kristen, so he

has stated on her behalf he agrees this is a nonjury matter. It sounds to me like you don't have reason to disagree with that under the law.

MR. HATCH:  Correct.  I accept that.

THE COURT:  So the question is, does this get decided on summary judgment or do we proceed to a bench trial to sort out these factual issues that are being banted about?

So before I let you go, then, because I only have a couple of minutes left, let's just for discussion purposes, let's just say that I agree with the Government that -- or I'm sorry, that I agree with Judge Almond that this needs to be tried to sort out these factual issues, as I look at this, there are probably a number of facts that are not in dispute that you would all probably stipulate to.  And there are probably a few facts that are in dispute, so my question for you, and this is, you know, primarily to the attorneys here I think, how long would it take to try this case?  What would be involved and how soon could you be ready to do it?

MR. PAUL:  Your Honor, I do not expect that it would take anywhere beyond a week to try this case.  That would probably be too much.  Definitely within a week's time.  As far as preparation, that, of course, depends on gelling all of our schedules.  I think the earliest possible date is the end of June, early July for the United States.

THE COURT:  Okay.  Mr. Levins.

MR. LEVINS:  Your Honor, I would agree with one week, and I think June, July works based on my schedule.

THE COURT:  All right.  Okay.  I'm going to take this under advisement, sort through it.  If I end up determining that I didn't think a trial is necessary, I'm going to -- I'll give your suggestions about June, July, you know, consideration.  I can't tell you whether I'll try it myself or send it to another judge for trial.  I'll have to kind of see where I am around that time, and so I don't give any guaranties on that.  I don't think it really much matters to you folks.  It's just a matter of scheduling whether this gets tried by me or tried by another judge, but I have to kind of see what my situation is.  Okay.

MR. PAUL:  Thank you, your Honor.

MR. LEVINS:  Thank you, your Honor.

THE COURT:  I'll get you a decision as soon as I can.

MR. PAUL:  Thank you.

(Proceedings Adjourned)

C E R T I F I C A T I O N


        I, Denise A. Webb, RPR, do hereby certify

that the foregoing pages is a correct transcription

from the official digital sound recording of the

proceedings in the above-entitled matter.


                Dated this 7th day of July, 2025




        /s/ Denise A. Webb_____

        Denise A. Webb, RPR
        Federal Official Court Reporter